STATE OF NORTH CAROLINA v. CHARLES PHILLIPS BOND

No. 143A95

(Filed 6 December 1996)

**1. Jury § 219 (NCI4th)— capital trial—death penalty for accessory—juror's inability to impose—excusal for cause**

The trial court did not err by excusing for cause in a capital murder trial a prospective juror who stated that he could not impose the death penalty on a defendant who did not pull the trigger after the venire had been informed by the State that defendant was not present when the murder was committed but was an accessory since the juror indicated that he could not follow the law regarding the death penalty. N.C.G.S. §§ 15A-1212(8) and (9).

**Am Jur 2d, Jury § 279.**

**Comment note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**Religious belief, affiliation, or prejudice of prospective juror as proper subject of inquiry or ground for challenge on voir dire. 95 ALR3d 172.**

**2. Jury § 123 (NCI4th)— ability to impose death sentence on accessory—not attempt to "stake-out" jurors**

The prosecutor did not improperly attempt to "stake-out" jurors in a capital murder trial by inquiring during *voir dire* into

1

the ability of prospective jurors to impose a death sentence on a defendant who is an accessory to first-degree murder where the prosecutor informed the prospective jurors that the evidence would show that defendant did not pull the trigger but was an accessory before the fact, and evidence of defendant's status as an accessory was uncontroverted.

**Am Jur 2d, Jury §§ 208, 267.**

**Comment note.-Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

3. **Jury § 158 (NCI4th)— capital trial—reopening examination of juror—inaccurate statement—good reason—peremptory challenge**

The trial court did not err by reopening the jury *voir dire* in a capital trial to allow the prosecution to exercise a peremptory challenge of a prospective juror it had already accepted where the juror told the prosecutor that he had no personal feeling concerning the death penalty but later told defense counsel that he personally could not support a death sentence, since the prospective juror could reasonably have been deemed to have made at least one incorrect statement within the meaning of N.C.G.S. § 15A-1214(g); even assuming that equivocation as to capital punishment did not constitute inaccuracy, such equivocation itself qualified as "good reason" to reopen *voir dire* within the purview of § 15A-1214(g). Once the trial court reopened the examination of the juror, the parties had an absolute right to exercise any remaining peremptory challenges to excuse such juror.

**Am Jur 2d, Jury § 279.**

**Comment note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

4. **Jury § 260 (NCI4th)— peremptory challenge—*Batson* inquiry—third step reached by court**

The trial court did not fail to reach the third step of the *Batson* inquiry requiring the court to determine whether defendant had carried his burden of proving purposeful discrimination in the State's use of a peremptory challenge where the court found that the State had presented neutral, nondiscriminatory

reasons for excusing the juror, overruled defendant's objection to the excusal, and denied defendant's motion.

**Am Jur 2d, Criminal Law § 684; Jury §§ 244, 246.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

**Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.**

5. **Jury § 260 (NCI4th)— peremptory challenge—death penalty hesitancy—race-neutral reason**

The trial court did not err in finding that the prosecutor's peremptory challenge of a black prospective juror was not purposeful discrimination where the prosecutor stated that the juror was excused because he expressed some hesitation and appeared to be concerned and worried when asked about the death penalty, and the prosecutor accepted eight African-American jurors who ultimately decided defendant's case and recommended the death penalty.

**Am Jur 2d, Jury §§ 244, 246, 279.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

**Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.**

6. **Robbery § 77 (NCI4th)— armed robbery—intent to deprive owner of property—sufficient evidence**

The State's evidence was sufficient to support a jury finding that defendant intended to permanently deprive the victim of his car so as to support defendant's conviction of armed robbery where the evidence tended to show that defendant and an accomplice kidnapped the victim and his sister in order to obtain the use of their car; during a period of eight hours, defendant forced the victim at gunpoint to drive his own car in two states, to stop at places where defendant wanted to stop, and to rob stores defendant told him to rob; although defendant told the hostages several times that he was going to let them go, he never did; defendant repeatedly ordered his accomplice to "waste" the vic-

tim and his sister "if they did anything wrong"; and when the victim attempted to disarm the accomplice, the accomplice, presumably following defendant's orders, shot and killed him.

**Am Jur 2d, Robbery §§ 18, 65.**

**Necessity and sufficiency of showing, in kidnapping prosecution, that detention was with intent to "secretly" confine victim. 98 ALR3d 733.**

7. **Criminal Law § 45 (NCI4th Rev.); Homicide § 17 (NCI4th)— aiding and abetting—actual or constructive presence not required—accessory before fact as aider and abettor**

Actual or constructive presence is no longer required to prove a defendant's guilt of a crime under an aiding and abetting theory. Thus, accessories before the fact, who do not actually commit the crime and may not have been present, can be convicted of first-degree murder under a theory of aiding and abetting. N.C.G.S. § 14-5.2.

**Am Jur 2d, Homicide §§ 28, 507; Trial § 1256.**

8. **Homicide § 251 (NCI4th)— accessory before fact—intent to kill—conditional threat to kill—occurrence of condition**

The State's evidence was sufficient to show that defendant had the *mens rea* necessary to commit premeditated and deliberate murder where it tended to show that defendant and his accomplice kidnapped the victim and his sister in order to obtain use of their car; defendant gave the accomplice a .380 semiautomatic pistol and told him to "waste" the hostages if they "messed up"; defendant repeated this command just before he left the car at a hospital to obtain treatment for an injured foot; and when the victim attempted to disarm the accomplice, the accomplice shot and killed the victim. A conditional threat to kill is proof of a specific intent to kill if the condition occurs, and the fact that defendant did not definitively know that the condition of the victim "messing up" would occur does not negate the specific intent defendant had for the accomplice to kill the victim if it did occur.

**Am Jur 2d, Homicide § 52.**

**Deliberation or premeditation as question of fact in prosecution for murder in first degree. 96 ALR2d 1437.**

Modern status of rules regarding malice aforethought, deliberation, or premeditation as elements of murder in the first degree. 18 ALR4th 961.

9. **Appeal and Error § 408 (NCI4th); Criminal Law § 696 (NCI4th Rev.)— capital trial—unrecorded conferences— presence of defendant—silent record—error not presumed**

Error will not be presumed from a silent record where defendant contends that he was absent during what he alleges were unrecorded charge conferences during two recesses at the end of the guilt-innocence and sentencing phases of his capital trial, the transcript shows that two recesses occurred, the transcript also shows that the trial judge conducted a complete jury instruction conference on the record in the presence of defendant at both phases of his trial, and the record is silent about what occurred at the recesses in question.

Am Jur 2d, Criminal Law § 649.

Federal constitutional right to confront witnesses— Supreme Court cases. 23 L. Ed. 2d 853.

Federal constitutional right to confront witnesses— Supreme Court cases. 98 L. Ed. 2d 1115.

10. **Evidence and Witnesses § 308 (NCI4th)— prior robbery— obtaining pistol used in kidnapping-murder—admissibility**

Evidence of defendant's prior robbery of a pawn shop during which he stole a pistol was admissible in defendant's kidnapping-murder trial to prove that defendant was the source of the weapon an accomplice used to shoot the kidnapping-murder victim. Further, testimony describing defendant's acts and statements during the pawn shop robbery was properly admitted to shed light on several probative issues in the case, including defendant's motive, *modus operandi*, identity as the instigator, and procurement of the murder weapon.

Am Jur 2d, Evidence §§ 341, 455.

11. **Criminal Law § 1386 (NCI4th Rev.)— capital sentencing— statutory mitigating circumstance—accessory—minor participation—jury's failure to find not error**

The jury's failure to find the N.C.G.S. § 15A-2000(f)(4) mitigating circumstance that "defendant was an accomplice in or an accessory to the capital felony committed by another person and

his participation was relatively minor" was not error where the evidence was undisputed that defendant was not present during the killing, but reasonable minds could disagree as to whether defendant's participation was minor.

**Am Jur 2d, Homicide § 553; Trial §§ 572, 841, 1447, 1760.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**12. Criminal Law § 1392 (NCI4th Rev.)— nonstatutory mitigating circumstances—jury's failure to find—death sentence not arbitrary**

The jury's failure to find nonstatutory mitigating circumstances concerning defendant's family history and upbringing did not indicate that the death sentence was arbitrarily imposed in violation of defendant's constitutional rights where the trial court gave the jury peremptory instructions on six of the eleven nonstatutory circumstances but no juror found any mitigation; the jury could rationally have rejected these nonstatutory circumstances on the basis that they had no mitigating value; and the jury's responses on the Issues and Recommendations form show that it considered and rejected the mitigating circumstances.

**Am Jur 2d, Criminal Law § 628; Trial §§ 841, 1760.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court Cases. 111 L. Ed. 2d 947.**

**13. Criminal Law § 1392 (NCI4th Rev.)— nonstatutory mitigating circumstance—ambiguous evidence—failure to submit not error**

The trial court did not err by failing to submit to the jury the requested nonstatutory mitigating circumstance that "defendant discontinued school at the age of 16" where testimony by defendant's witness was ambiguous as to whether defendant stopped going to school completely or was merely suspended temporarily but had not completely discontinued his schooling, and there was no other evidence which clarified this issue.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554.**

**14. Criminal Law § 1392 (NCI4th Rev.)— mitigating circumstance—request—subsumption by submitted circumstance**

The trial court did not err by failing to submit to the jury the requested nonstatutory mitigating circumstance that defendant was not present when his accomplice shot the victim where this circumstance was subsumed by the court's submission to the jury of the nonstatutory mitigating circumstance that defendant was in the hospital seeking treatment for a self-inflicted wound at the time his accomplice shot the victim.

**Am Jur 2d, Criminal Law §§ 598, 599; Trial § 1441.**

**15. Criminal Law § 1392 (NCI4th Rev.)— nonstatutory mitigating circumstances—requests combined into one—no error**

Where defendant requested the submission of two nonstatutory mitigating circumstances (1) that defendant began his substance abuse at the age of nine, and (2) that defendant has been diagnosed as being dependent on a combination of alcohol, cocaine, and marijuana, the trial court did not err by combining these circumstances into the single circumstance that defendant began his substance abuse at the age of nine and has been diagnosed as being dependent on a combination of alcohol, cocaine, and marijuana.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**16. Criminal Law § 1340 (NCI4th Rev.)— capital sentencing— mitigating evidence—rebuttal by lay opinion testimony**

Where two of defendant's teachers and a social worker testified in a capital sentencing hearing that defendant was mentally retarded, an officer was properly permitted to rebut this mitigating evidence by lay opinion testimony that, based on his personal experiences with defendant, he did not think defendant was retarded. The mental condition of another is an appropriate subject for lay opinion.

**Am Jur 2d, Criminal Law §§ 40, 598; Homicide § 554; Jury § 206.**

**Expert testimony as to specific intent unnecessary for conviction. 16 ALR4th 666.**

**Propriety of imposing capital punishment on mentally retarded individuals. 20 ALR5th 177.**

**17. Criminal Law §§ 498, 1340 (NCI4th Rev.)— capital sentencing—jury view of vehicle—relevancy to show aggravating circumstance**

The trial court did not abuse its discretion during a capital sentencing proceeding in permitting the jury to view the Volkswagen "beetle" in which defendant and his accomplice held the murder victim and his sister hostage for nearly eight hours before the victim was killed since this evidence was relevant on the issue of the especially heinous, atrocious, or cruel aggravating circumstance to show the circumstances of the crime and the nature of defendant's action in confining the victim in a small, cramped automobile for eight hours. This evidence was not rendered unreliable because the vehicle was wrecked after the murder where a sheriff testified that the majority of damage to the Volkswagen occurred when the accomplice ran into a roadblock and that there was no change to the interior of the vehicle.

**Am Jur 2d, Homicide §§ 419, 553, 555; Trial § 572.**

**Presence of judge at view by jury in criminal case. 47 ALR2d 1227.**

**18. Criminal Law § 1392 (NCI4th Rev.)— capital sentencing—principal ineligible for death penalty—not mitigating circumstance**

In a capital sentencing proceeding for a first-degree murder for which defendant was convicted as an accessory before the fact, evidence that the principal was ineligible for the death penalty was properly excluded from the jury's consideration as a mitigating circumstance.

**Am Jur 2d, Criminal Law §§ 167, 172, 176.**

**Acquittal of principal, or his conviction of lesser degree of offense, as affecting prosecution of accessory, or aider and abettor. 9 ALR4th 972.**

**19. Criminal Law § 1366 (NCI4th Rev.)- capital sentencing—aggravating circumstances—murder during felony—submission for three separate felonies**

The trial court did not err by three times submitting in a capital sentencing proceeding the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the murder was committed during the course of a felony based upon the kidnapping of the murder vic-

tim, the kidnapping of the murder victim's sister, and one count of armed robbery where the State presented distinct evidence that defendant committed each of these three felonies during the course of the murder.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 46, 554.**

**What felonies are inherently or foreseeably dangerous to human life for purposes of felony-murder doctrine. 50 ALR3d 397.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

20. **Criminal Law § 460 (NCI4th Rev.)— capital sentencing— closing argument—death penalty—biblical references—no impropriety**

The trial court did not err in allowing the prosecutor to argue to the jury in a capital sentencing proceeding that "the Bible says that he that smiteth a man so that he dies shall surely be put to death" where the prosecutor was anticipating and rebutting an argument which she had reason to believe defense counsel would raise in reference to the death penalty.

**Am Jur 2d, Trial §§ 572, 609.**

**Prosecutor's appeal in criminal case to racial, national, or religious prejudice as ground for mistrial, new trial, reversal, or vacation of sentence—modern cases. 70 ALR4th 664.**

21. **Criminal Law § 460 (NCI4th Rev.)— capital sentencing— closing argument—biblical reference—no impropriety**

The trial court did not err in allowing the prosecutor to argue to the jury in a capital sentencing proceeding that "justice under the law has been upheld and supported by the Good Book" where, just before making this argument, the prosecutor cautioned the jury that this case was not being tried by biblical law, but by man's law, specifically referring to N.C.G.S. § 15A-2000.

**Am Jur 2d, Trial §§ 572, 609.**

Prosecutor's appeal in criminal case to racial, national, or religious prejudice as ground for mistrial, new trial, reversal, or vacation of sentence—modern cases. 70 ALR4th 664.

22. **Criminal Law § 453 (NCI4th Rev.)— capital sentencing— closing argument—victim impact statement**

The prosecutor's closing argument in a capital sentencing proceeding asking if the jurors could imagine themselves in the position of the murder and kidnapping victims' parents was permissible as a type of victim impact statement; in any event, the argument was not so grossly improper as to require the trial court to intervene *ex mero motu.*

Am Jur 2d, Criminal Law § 291; Homicide § 560.

Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.

23. **Criminal Law § 454 (NCI4th Rev.)— closing argument—victim's fear and emotions**

The prosecutor's closing argument asking the jury in a capital sentencing proceeding to try to imagine the fear and emotions of a kidnapping victim while she and her brother, the murder victim, were held hostage for eight hours in a small Volkswagen and her brother was forced by defendant to commit armed robberies was not so grossly improper as to require the trial court to intervene in the absence of an objection by defendant.

Am Jur 2d, Trial §§ 664, 665.

24. **Criminal Law § 690 (NCI4th Rev.)— capital sentencing— mitigating circumstance—minor participation—peremptory instruction not required**

The trial court did not err by failing to peremptorily instruct the jury in a capital sentencing proceeding on the N.C.G.S. § 15A-2000(f)(4) mitigating circumstance "that defendant was an accomplice in or an accessory to the felony murder committed by another person and his participation was relatively minor" where the evidence was uncontradicted that defendant was not present when the victim was killed by his accomplice but was at a hospital receiving treatment for an injured foot, but the State presented evidence that defendant was not a minor participant in the mur-

der in that he had orchestrated a robbery in Virginia that led to the kidnapping of the murder victim and his sister; defendant took control of the victims' car at gunpoint; defendant forced the murder victim to participate in several attempted robberies with the accomplice; defendant was twenty-nine years older than his teenaged accomplice; defendant equipped the accomplice with the murder weapon; and defendant gave all of the orders to the accomplice.

**Am Jur 2d, Homicide § 554; Trial §§ 841, 1760.**

**Acquittal of principal, or his conviction of lesser degree of offense, as affecting prosecution of accessory, or aider and abettor. 9 ALR4th 972.**

**25. Criminal Law § 1402 (NCI4th Rev.)— first-degree murder— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not disproportionate where defendant was convicted under the felony murder rule and on the basis of malice, premeditation and deliberation; defendant was also convicted of first-degree kidnapping of both the murder victim and his sister and of armed robbery; defendant orchestrated the killing of an unarmed victim whom defendant kept hostage after kidnapping him from his own home at gunpoint and forcing him to commit armed robbery for defendant's financial gain; defendant was in a position of control during the crimes at issue and subjected his sixteen-year-old accomplice to his dominance, ordering that the boy kill the victims if they "messed up"; the murder victim was shot and killed by the accomplice when he attempted to disarm the accomplice; defendant had previously been convicted of four violent felonies, including manslaughter, second-degree robbery, armed robbery, and aiding and abetting an armed robbery; the killing in this case was part of an armed robbery; the killing was done to eliminate a witness; and there were two victims, one of whom survived. Failure of the jury to find any mitigating circumstances did not indicate that the death sentence was arbitrarily imposed where eight of the mitigating circumstances submitted dealt with defendant's childhood up to age fourteen; defendant was forty-five years old at the time of the present crimes, and a jury could have rationally found that defendant's childhood circumstances did not have a mitigating effect on his violent criminal activity over thirty years later; and the jury could rationally have rejected

STATE v. BOND

[345 N.C. 1 (1996)]

the submitted mitigating circumstance that defendant's participation in the crimes was minor.

**Am Jur 2d, Criminal Law §§ 538, 628; Homicide § 556; Trial § 572.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed to avoid arrest or prosecution, to effect escape from custody, to hinder governmental function or enforcement of law, and the like—post-*Gregg* cases. 64 ALR4th 755.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Grant (Cy A.), J., on 23 March 1995 in Superior Court, Bertie County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for first-degree kidnapping and robbery with a dangerous weapon was allowed 19 December 1995. Heard in the Supreme Court 13 September 1996.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

MITCHELL, Chief Justice.

Defendant Charles Phillips Bond was convicted on 15 March 1995 of the first-degree murder of Wayne Leon Thomas, robbery with a dangerous weapon, and two counts of first-degree kidnapping. The

jury answered special issues as to the basis for its verdict, stating it found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation as well as under the felony murder rule. The felonies which the jury relied upon for the felony murder verdict were the kidnapping of Wayne Leon Thomas, the kidnapping of Leslie Dawn Thomas, and robbery with a dangerous weapon. After a separate capital sentencing proceeding, the jury recommended a sentence of death, and the trial court sentenced defendant accordingly. The trial court also sentenced defendant to consecutive terms of forty years imprisonment for each of the felony convictions.

The State's evidence tended to show *inter alia* that on 24 March 1994, defendant, Theola Saunders, and two other men drove from North Carolina to Virginia to commit a robbery. The attempted robbery was interrupted by the police, and in fleeing, defendant shot himself in the foot. Defendant and Saunders kidnapped Wayne and Leslie Thomas in order to obtain use of their car. Defendant directed the Thomases, brother and sister, to drive defendant and Saunders back to North Carolina. During the course of the evening, defendant ordered Wayne to help Saunders rob various establishments, including convenience stores and restaurants, which they attempted to do. Each time, defendant told Saunders to kill Wayne if he did anything wrong. Defendant held Wayne and Leslie hostage for a total of eight hours, during which time defendant would occasionally tell the victims he was going to let them go. This he never did. After one robbery attempt was successful, defendant told Wayne to take him to the hospital so he could get medical care for his foot. At the hospital, defendant got out of the car and told Saunders and the victims to come back and pick him up in an hour or two. Defendant also told Saunders to "waste" the Thomases if they did anything wrong.

At some point while driving around, Wayne told Saunders that he needed to use the bathroom. Saunders directed them to a convenience store, and Leslie and Wayne went inside. Saunders waited outside. Wayne told Leslie they had to do something, that defendant and Saunders were not going to let them go, and that they were going to kill them anyway. The brother and sister returned to the car, and, as Saunders was getting in the backseat, Wayne grabbed Saunders from behind and yelled, "run, Leslie." In the ensuing struggle, Saunders shot and fatally wounded Wayne Thomas. Saunders then fled and was soon apprehended. The evidence was undisputed that defendant was not actually present at the time of the shooting but that defendant had orchestrated the robbery, attempted robberies, and kidnappings and

STATE v. BOND

[345 N.C. 1 (1996)]

had great influence over his young accomplice. Defendant was arrested at the hospital.

[1] By his first assignment of error, defendant contends that the trial court erred in excusing prospective juror Joseph White. During the *voir dire*, the prosecutor asked prospective juror White if he would be able to recommend the death penalty for someone who did not actually "pull the trigger." Mr. White stated that he could not and that if a person did not actually commit the murder himself, he did not see why that person should die. The trial court then allowed the State's motion to excuse Mr. White for cause. Defendant argues that prospective juror White's statement was an insufficient basis for exclusion under *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985). We disagree.

The pertinent colloquy between the prosecutor and Mr. White is as follows:

The evidence will show [the defendant] did not pull the trigger. Would any of you feel like simply because he did not pull the trigger, you could not consider the death penalty and follow the law concerning the death penalty?

All of you understand what I'm saying?

MR. WHITE: I think it would be kind of hard, you know, to give somebody the death penalty if they didn't commit the murder theirself.

Q. Okay. And that's why I'm asking the question. His Honor will tell you what the law is. He'll go through the law with you.

. . . .

And what I'm asking you, Mr. White, . . . if, because of your belief, you would not be able to follow the law concerning this, then I would need to know that now.

Is that how you feel?

A. I don't think it's right to give someone the death penalty if they didn't actually commit the crime themselves.

Q. So regardless of what the circumstances might be concerning the crime, the facts might be concerning the crime, you do not

**STATE v. BOND**

[345 N.C. 1 (1996)]

feel that you could recommend the death penalty if that person did not actually pull the trigger; is that correct?

A. Yes, because I feel the person that done—that committed the murder; he brought it on himself. . . .

. . . .

Q. . . . So if I understand you correctly, regardless of the facts and circumstances concerning the case, you could not recommend the death penalty for anyone unless it was the person who pulled the trigger—

A. Yes.

The prosecutor challenged Mr. White for cause, and defendant objected. After a brief bench conference, the prosecutor rephrased his last question as follows:

Q. Mr. White, let me just ask the question again. Regardless of what the facts and circumstances would be in the case and what the law might be in this case, you would not, because of your own personal feelings concerning the death penalty, would not be able to recommend the death penalty regardless of the law and regardless of the facts unless it was the person who actually did the murder, committed the crime?

A. Yes, I mean, I don't—if he didn't commit the murder, actually commit the murder, I don't see why he should die. That would be kind of hard for me to do.

Over defendant's objection, the prospective juror was excused for cause. Defendant contends that Mr. White was not excludable under *Witherspoon*, 391 U.S. 510, 20 L. Ed. 2d 776, and *Witt*, 469 U.S. 412, 83 L. Ed. 2d 841. The appropriate analysis, however, does not reach either of these landmark decisions, because Mr. White stated that he could not follow the law regarding the death penalty.

We have held that it is error not to excuse a juror whose answers show that he could not follow the law. *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992); *see also State v. Abraham*, 338 N.C. 315, 342, 451 S.E.2d 131, 145 (1994) (a juror who stated she would require the defendant to testify was properly excused for cause); *State v. Cunningham*, 333 N.C. 744, 754, 429 S.E.2d 718, 720 (1993) (a juror who stated she would require the defendant to prove his innocence should have been excused for cause). N.C.G.S.

§ 15A-1212(8) provides that a challenge for cause to an individual juror may be made by any party on the ground that the juror as a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina. N.C.G.S. § 15A-1212(8) (1988). Subsection (9) of the statute is a catchall category, allowing a challenge for cause where a juror "for any other cause is unable to render a fair and impartial verdict." Based on Mr. White's responses indicating that he could not impose the death penalty on a defendant who did not pull the trigger and given that the venire had been informed by the State that defendant was not present when the murder was committed, the excusal for cause of Mr. White should have been allowed under both subsections (8) and (9) of N.C.G.S. § 15A-1212. Mr. White's answers indicating that he could not impose the death penalty on an accessory show that he could not follow the law.

[2] Defendant further contends that the prosecutor employed improper "stake-out" tactics with prospective juror White during the *voir dire* and that this improper line of questioning resulted in Mr. White's being excused for cause. Defendant's contention is misplaced. It is proper for counsel to ask a juror if he will accept and follow the law as given to the jury. However, as this Court noted in *State v. Vinson*, 287 N.C. 326, 215 S.E.2d 60 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976), those questions that attempt to elicit in advance what a juror would decide under hypothetical circumstances are improper.

> [S]uch questions tend to "stake out" the juror and cause him to pledge himself to a future course of action. This the law neither contemplates nor permits. The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts.

*Id.* at 336, 215 S.E.2d at 68. In *State v. Davis*, 325 N.C. 607, 386 S.E.2d 418 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990), we held impermissible the following question: "Would the fact that the defendant had no significant history of any criminal record, would that be something that you would consider important in determining whether or not to impose the death penalty?" *Id.* at 621, 386 S.E.2d at 425. We noted in *Davis* that no evidence of the defendant's criminal history had been introduced during *voir dire*. We found it was an improper hypothetical question which the trial court could view as

**STATE v. BOND**

[345 N.C. 1 (1996)]

"an attempt to indoctrinate a prospective juror regarding the existence of a mitigating circumstance." *Id.*

The facts of the instant case distinguish it from *Davis*. First, the prosecutor had informed the pool of prospective jurors that defendant was an accessory, a fact that the State, the party with the burden of proof, had conceded. Second, this was a question consisting of facts alleged to be proved, rather than a question consisting of a hypothetical set of circumstances. In this case, the State informed the prospective jurors that the trial judge might instruct them concerning an accessory before the fact and told them that an accessory is one who encourages or procures or counsels an illegal act. The State then told the prospective jurors that an accessory can be found guilty of first-degree murder. Next, the prosecutor told them that the evidence would show that defendant did not pull the trigger and asked the prospective jurors whether they believed they could consider the death penalty in such a case. Thus, the fact that defendant was not charged nor going to be tried as a principal was uncontroverted. The State, which had the burden of establishing defendant's guilt, sought to show that defendant was an accessory by informing the prospective jurors that the evidence would show that defendant did not pull the trigger. This was not an improper staking out of any prospective juror, including Mr. White. We conclude that the trial court did not abuse its discretion in reopening the *voir dire* of prospective juror White and that under these circumstances, where evidence of defendant's status as an accessory was uncontroverted, it was not an abuse of discretion for the trial court to allow the State to inquire during *voir dire* into the ability of prospective jurors to impose a death sentence on a defendant who is an accessory to first-degree murder.

The nature and extent of the inquiry made of prospective jurors on *voir dire* ordinarily rests within the sound discretion of the trial court. *State v. Brown*, 315 N.C. 40, 53, 337 S.E.2d 808, 820 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). When a prospective juror's answer during *voir dire* is equivocal, the trial court has discretion to question the juror further in order to clarify his or her position and excuse the juror for cause. Here, prospective juror White's answers indicated some degree of equivocation; thus, the trial court was entitled to use its discretion. The defendant has shown no abuse of discretion in the present case. This assignment of error is overruled.

STATE v. BOND

[345 N.C. 1 (1996)]

By another assignment of error, defendant argues that the trial court erred by not intervening *ex mero motu* to prohibit the State from asking the remainder of the prospective jurors whether they would be willing to recommend death for defendant if he was only an accessory. Defendant contends that this series of questions tended to stake out the jurors, violating defendant's constitutional rights to due process, to a fair and impartial jury, and to a fair and reliable sentencing hearing under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, 24, and 27 of the North Carolina Constitution, thus entitling him to a new trial. We find no merit to this argument. As discussed previously, the question of whether prospective jurors could consider the death penalty for an accessory is not an improper stake-out question where, as here, it was uncontroverted that defendant was only an accessory. Given the peculiar posture of this case, where defendant's status as an accessory was all but stipulated to and where the State conceded that defendant did not pull the trigger, it was not improper for the State to inquire whether prospective jurors could consider recommending the death penalty. The trial court did not commit error in failing to intervene *ex mero motu* to prevent the prosecutor from pursuing this line of questioning. This assignment of error is overruled.

[3] By another assignment of error, defendant argues that the trial court improperly reopened the jury *voir dire* to allow the prosecution to exercise a peremptory challenge against prospective juror Kenneth Robbins, whom the prosecutor had already accepted. Defendant argues that according to N.C.G.S. § 15A-1214, a trial court may allow reexamination of a prospective juror upon two circumstances: if it is discovered that the juror has made an incorrect statement during *voir dire* or if some other good reason exists. Defendant contends that neither situation had occurred and that nothing warranted this action by the trial court.

The prosecution asked prospective juror Robbins a series of "death-qualifying" questions. The next day, defense counsel examined Mr. Robbins in an effort to determine whether he could consider a life sentence. The exchange was as follows:

Q. You [Mr. Robbins] indicated to us earlier that you felt like that under the appropriate circumstances, you could support the death sentence; is that correct?

A. By law I could, but personally, as me having, you know, for myself, I couldn't. But by law I could.

**STATE v. BOND**

[345 N.C. 1 (1996)]

Q. So you wouldn't say that your support of the death penalty is so strong that you could not consider life imprisonment. In other words, you feel like you could consider both the death sentence and life imprisonment?

A. Yes.

The prosecutor, concerned about this response, asked the court to question Mr. Robbins further. The colloquy between the court and prospective juror Robbins was as follows:

THE COURT: I want to inquire or ask you whether you have changed your mind about your views on the death penalty from yesterday when Mr. Beard was asking you questions?

A. No, basically I still feel that, you know, it depends on the situation. But personally, I wouldn't want to be put in a predicament to have to, you know, make the decision.

THE COURT: But you do understand that if you're selected as a juror, there's a possibility that you will be placed in that predicament?

A. Yes.

THE COURT: Could you follow the law and if the law indicated that the appropriate punishment was death, could you vote for death?

A. I feel like I could by law.

At the prosecutor's request, the court reopened examination of Mr. Robbins the following day, whereupon the State exercised a peremptory challenge excusing Mr. Robbins. Defendant contends that Mr. Robbins was a qualified juror and that it was error for the trial court to reopen *voir dire*. We disagree.

This Court has previously interpreted the language of N.C.G.S. § 15A-1214(g) and found that the decision to reopen *voir dire* rests in the trial court's discretion. *State v. Parton*, 303 N.C. 55, 70-71, 277 S.E.2d 410, 421 (1981). We clarified this decision later in *State v. Freeman*, 314 N.C. 432, 333 S.E.2d 743 (1985), and held that once the trial court has reopened the examination of a juror, the parties have an "absolute right to exercise any remaining peremptory challenges" to excuse such a juror. *Id.* at 438, 333 S.E.2d at 747. Thus, absent a showing of abuse of discretion, the trial court's decision to reopen the examination of prospective juror Robbins will not be disturbed.

**STATE v. BOND**

[345 N.C. 1 (1996)]

Prospective juror Robbins told the prosecutor that he had no personal feeling concerning the death penalty and later told defense counsel that he personally could not support a death sentence. This indicated that Mr. Robbins might have changed his mind about whether he could impose the death penalty. N.C.G.S. § 15A-1214 allows a trial court, in its discretion, to reopen *voir dire* "[i]f at any time after a juror has been accepted by a party, and before the jury is impaneled, it is discovered that the juror has made an incorrect statement during voir dire or that some other good reason exists." N.C.G.S. § 15A-1214(g) (1988). Prospective juror Robbins made equivocal statements concerning his views on the death penalty. Given his ambivalent responses, Mr. Robbins could reasonably be deemed to have made at least one incorrect statement. Even assuming, *arguendo*, that equivocation as to capital punishment does not equal inaccuracy, we conclude that such equivocation itself qualifies as a "good reason" to reopen *voir dire*.

Upon request by the prosecutor, the trial court in this case reopened the *voir dire*, examined Mr. Robbins in an effort to determine whether a basis for a challenge for cause existed, and found that it did not. Thereafter, counsel was free to exercise any remaining peremptory challenges. This assignment of error is overruled.

By another assignment of error, defendant contends that his right to be tried by a jury selected without regard to race was violated by the prosecutor's discriminatory use of peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

In *Batson*, the United States Supreme Court created a three-pronged test to determine whether a prosecutor impermissibly excused prospective jurors on the basis of their race. First, a criminal defendant must establish a *prima facie* case of intentional discrimination by the prosecutor. Finding a *prima facie* case shifts the burden to the State, which must give race-neutral explanations for peremptorily challenging a juror of a cognizable group. The reason does not have to be plausible. *Purkett v. Elem*, —— U.S. ——, ——, 131 L. Ed. 2d 834, 839 (1995). What is at issue in the second step is the " 'facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 114 L. Ed. 2d 395, 406 (1991)). Once the State gives an explanation for its peremptory challenges, the trial court then determines "whether the defendant has carried his burden of

STATE v. BOND

[345 N.C. 1 (1996)]

proving purposeful discrimination." *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). Factors the trial court considers include: the susceptibility of the case to racial discrimination, the prosecutor's demeanor, and the explanation itself. *State v. Porter*, 326 N.C. 489, 391 S.E.2d 144 (1990). However, *Batson* admonishes a reviewing court to remember that the trial court's findings will, in large measure, hinge on credibility and to give those findings great deference. *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21.

[4] Defendant contends that the reasons the prosecutor gave the court upon excusing prospective juror Corris Jenkins, a black male, were pretextual and race-based and that the trial court erred in failing to reach the third step of the *Batson* inquiry. Defendant made a *Batson* motion in opposition to the State's peremptory challenge of Mr. Jenkins, stating his grounds for a *prima facie* case: "I think this is the ninth juror that he has dismissed and of those, eight were black." The prosecutor, upon request by the court to give an explanation for excusing Mr. Jenkins, stated that the juror expressed some hesitation and that he appeared to be concerned and worried when asked about the death penalty. The trial court found that the State had presented neutral, nondiscriminatory reasons for excusing Mr. Jenkins; overruled defendant's objection to the excusal; and denied defendant's *Batson* motion. These findings indicate that the trial judge completed the third step in the *Batson* analysis. Thus, defendant's contention that the trial court failed to reach step three of the *Batson* inquiry is without merit.

[5] Defendant also contends that the trial court erred in finding that the prosecutor's excusal of prospective juror Jenkins was not purposeful discrimination. He argues that hesitancy in answering death-qualification questions is an "essentially unreviewable, elusive reason for striking a juror." This Court has upheld trial court decisions finding that juror hesitancy on answering questions about the death penalty is a race-neutral reason for excusing a juror. *See, e.g., State v. Best*, 342 N.C. 502, 512-13, 467 S.E.2d 45, 52, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 65 U.S.L.W. 3262 (1996); *State v. Kandies*, 342 N.C. 419, 435-36, 467 S.E.2d 67, 76, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 65 U.S.L.W. 3264 (1996). We accorded the trial courts' findings on the *Batson* issue in those cases much deference, and we accord the trial court's findings in the instant case the same deference. In doing so, we reiterate our statement in *State v. Floyd*, 343 N.C. 101, 104, 468 S.E.2d 46, 48, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 65 U.S.L.W. 3264 (1996), with respect to deference.

**STATE v. BOND**

[345 N.C. 1 (1996)]

Whether the prosecutor intended to discriminate against the members of a race is a question of fact, the trial court's ruling on which must be accorded great deference by a reviewing court. This is so because often there will be little evidence except the statement of the prosecutor, and the demeanor of the prosecutor can be the determining factor. The presiding judge is best able to determine the credibility of the prosecutor.

In the instant case, the trial court was in the best position to observe firsthand the prosecutor's demeanor and countenance during the *voir dire*, and we accord its decision to allow the State to excuse Mr. Jenkins due deference. Moreover, we note that the record reflects that the prosecutor accepted every one of the eight African-American jurors who ultimately decided defendant's case and recommended the death penalty. We find no indication of discrimination in the prosecutor's use of peremptory challenges during the *voir dire*. This assignment of error is overruled.

By another assignment of error, defendant contends the evidence was insufficient to show that defendant committed robbery with a dangerous weapon, and that it was insufficient to prove the existence of the aggravating circumstance that the killing occurred during the course of a robbery, and that the trial court erred by denying his motions to dismiss the robbery charge. We disagree.

[6] Defendant argues that the State's evidence was deficient in two respects: there was no showing that defendant had the specific intent necessary to commit a robbery, and there was no evidence that defendant was actually or constructively present when Theola Saunders took possession of Wayne Thomas's automobile, as required under either of the two theories of robbery submitted to the jury. We address each contention in turn.

When considering a motion to dismiss for insufficiency of the evidence, the trial court must determine whether there is substantial evidence of each essential element of the offense charged and of defendant being the perpetrator of the offense. *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). The reviewing tribunal considers the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Quick*, 329 N.C. 1, 405 S.E.2d 179 (1991).

Robbery, a common law offense not defined by statute in North Carolina, is an aggravated form of larceny. *State v. Smith*, 268 N.C.

167, 150 S.E.2d 194 (1966). More precisely, robbery is " 'the taking, with intent to steal, of the personal property of another, from his person or in his presence, without his consent or against his will, by violence or intimidation.' " *State v. Lunsford,* 229 N.C. 229, 231, 49 S.E.2d 410, 412 (1948) (quoting Justine Miller, *Handbook of Criminal Law* § 123 (1934)), *quoted in Smith,* 268 N.C. at 169, 150 S.E.2d at 198. The evidence, when considered in the light most favorable to the State, is sufficient to permit a rational trier of fact to find that defendant possessed the intent to permanently deprive Wayne Thomas of his car. The State's evidence tended to show that defendant placed the car under his control by forcing Wayne at gunpoint to drive it where defendant wanted to go.

The fact that defendant later relinquished control of the car when he demanded that Wayne take defendant to the hospital is not dispositive of the intent issue. As we indicated in *Smith,* felonious intent to permanently deprive the owner of his property is not disproved when a defendant abandons the property. 268 N.C. at 172, 150 S.E.2d at 200. We stated the law in *Smith* as follows:

> When, in order to serve a temporary purpose of his own, one takes property (1) with the specific intent wholly and permanently to deprive the owner of it, or (2) under circumstances which render it unlikely that the owner will ever recover his property and which disclose the taker's total indifference to his rights, one takes it with the intent to steal (*animus furandi*).

*Id.* at 173, 150 S.E.2d at 200. In the course of one evening, encompassing approximately eight hours, defendant forced Wayne at gunpoint to drive his own vehicle in two states, to stop at places where defendant wanted him to stop, and to rob stores defendant told him to rob. Although defendant told Leslie Thomas several times in response to her inquiries that he was going to let them go, he never did, even after they got back to North Carolina. Defendant repeatedly ordered his accomplice to "waste [Wayne and Leslie] if they do anything wrong." When Wayne attempted to disarm Saunders, Saunders, presumably following his orders from defendant, shot and killed Wayne Thomas. Such evidence was sufficient to indicate defendant's total indifference to Wayne's rights and indicates that defendant took Wayne's car with the intent to steal.

[7] We find defendant's contention that actual or constructive presence is required for a conviction of aiding and abetting to be unpersuasive. Although several of our cases decided before 1981 state that

actual or constructive presence is required to prove a crime under an aiding and abetting theory, this is no longer required. Our legislature abolished all distinctions between accessories before the fact and principals in the commission of felonies by enacting N.C.G.S. § 14-5.2, effective 1 July 1981. Thus, accessories before the fact, who do not actually commit the crime, and indeed may not have been present, can be convicted of first-degree murder under a theory of aiding and abetting. A showing of defendant's presence or lack thereof is no longer required.

In *State v. Francis*, 341 N.C. 156, 459 S.E.2d 269 (1995), we upheld the trial court's instruction on aiding and abetting in which it stated that the jury must find three things in order to convict the defendant of first-degree murder on that theory: (1) that the crime was committed by another; (2) that the defendant knowingly advised, instigated, encouraged, procured, or aided the other person; and (3) that the defendant's actions or statements caused or contributed to the commission of the crime by the other person. *Id.* at 161, 459 S.E.2d at 272. Accordingly, the pattern jury instructions stating the elements of aiding and abetting do not require a showing of a defendant's presence or lack thereof during the commission of the crime. *See, e.g.*, N.C.P.I.—Crim. 202.20A (1989). In the instant case, the trial court instructed the jury using this pattern jury instruction, and in accordance with the requirements delineated in *Francis*. The trial court was not required to instruct the jury on defendant's absence; thus, defendant's contention is without merit. This assignment of error is overruled.

By another assignment of error, defendant argues that the evidence was insufficient to convict defendant of premeditated and deliberate murder. He contends that his conviction for first-degree murder on the basis of premeditation and deliberation was obtained in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Article I, Sections 19 and 23 of the North Carolina Constitution and that the conviction must be vacated. We disagree.

Defendant contends that the State's evidence was insufficient to show that he was actually or constructively present at the time of the murder. As discussed previously in this opinion, a showing of a defendant's presence during the commission of a crime is no longer required in order to establish that a defendant aided and abetted another in committing a crime. This contention is without merit.

[8] Defendant also contends that the State's evidence was insufficient to prove that defendant had the *mens rea* necessary to commit premeditated and deliberate murder. He argues that telling Saunders to "waste them if they mess up" was not a fixed design, but was a conditional threat, insufficient to prove specific intent.

In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the State. *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). The State's evidence tended to show that Leslie Thomas believed defendant's statement to Saunders to "waste" them to mean that defendant intended for Saunders to kill them. Leslie testified that during the brief period when the Thomases were alone just before Wayne was shot, Wayne told Leslie that they had to try to do something because defendant and the boy were going to kill them anyway. The State's evidence also tended to show that defendant gave Saunders the means to kill the victims, in the form of a .380 semiautomatic pistol. Just before defendant got out of the car at the hospital, he repeated his command to Saunders to "waste" the hostages if they did anything wrong. We agree with the State's contention that a conditional threat to kill is proof of specific intent to kill if the condition occurs. The fact that defendant did not definitively know that the condition of the victims' "messing up" would occur does not negate the specific intent defendant had for Saunders to kill the Thomases if it did occur. Looking at the evidence in the light most favorable to the State, we conclude that there was sufficient evidence that the jury could have found that defendant had the specific intent that the victim who "messed up," Wayne Thomas in this case, be killed. There was substantial evidence that defendant possessed the elements of first-degree murder by malice, premeditation, and deliberation. This assignment of error is overruled.

[9] By another assignment of error, defendant contends that the trial court conducted several unrecorded charge conferences in his absence, at both the guilt-innocence phase and the capital sentencing proceeding, and that this violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, 24, and 27 of the North Carolina Constitution. Defendant further argues that on the facts of this case, such error was not harmless beyond a reasonable doubt and that he is therefore entitled to a new trial or new capital sentencing proceeding. We disagree.

Defendant contends that because he was absent during what he alleges were unrecorded charge conferences, he was convicted on a theory of aiding and abetting, which connotes greater culpability, rather than on a theory of accessory before the fact, which defendant argues better fit the facts of this case. The transcript in this case reveals that there were two recesses lasting about three hours each, one after the close of the evidence at the guilt-innocence phase, and the other after the close of the evidence at the capital sentencing proceeding. The record does not reveal what occurred during the two recesses in question. Just before the first recess, the trial court addressed the jury as follows:

Members of the jury, you have heard all the evidence in this case. The State has rested and the defendant has informed the court that the defendant has elected not to put on any evidence. The next thing that will occur will be jury instructions between myself and the attorneys. And that will take maybe one or two hours.

The next thing that occurred, according to the transcript, was a formal charge conference with defendant and all counsel present. Just after the second recess at issue in this case, during the capital sentencing proceeding, the trial court again conducted a formal charge conference in the presence of defendant and all counsel. Thus, the transcript reveals that the trial judge conducted a complete jury instruction conference on the record in the presence of defendant at both the guilt-innocence and sentencing phases of the trial. The record is silent about what took place during the two recesses in question. As we stated in *State v. Adams*, 335 N.C. 401, 439 S.E.2d 760 (1994), we will not presume error from a silent record. This assignment of error is overruled.

[10] By another assignment of error, defendant contends that the trial court erred in admitting evidence regarding defendant's participation in a prior robbery. Defendant argues that evidence of this prior robbery was inadmissible character evidence which unfairly prejudiced him in this case. We disagree.

The State's evidence, consisting of the testimony of two witnesses, tended to show the following: Defendant, armed with a sawed-off shotgun, and an unarmed man went into Bunny's Pawn Shop. Defendant pointed the gun at the pawn store clerk and ordered her to sit down. Defendant saw a .380 semiautomatic pistol under the

counter, picked it up, and put it in his pocket. This weapon was later identified at trial in the instant case as the gun that defendant gave to Theola Saunders and that Saunders used to shoot the victim in this case. Defendant told his robbery accomplice to put the jewelry in a bag, and the two men left after taking all the jewelry. In the opinions of both witnesses, defendant was the one in charge and did all the talking, while the other, unarmed man never spoke.

Defendant contends that the admission of the evidence of his prior robbery of Bunny's Pawn Shop was erroneous because it was not probative of any genuine question of fact at issue in the case. He also argues that if the evidence was relevant, its probative value was outweighed by the danger of unfair prejudice. Finally, defendant argues that the State's evidence of the Bunny's Pawn Shop robbery was more expansive than necessary. We address each contention in turn.

We conclude that the evidence of the Bunny's Pawn Shop robbery was probative, as it tended to prove defendant was the source of the weapon Saunders used to shoot Wayne Thomas. In *State v. Rannels*, 333 N.C. 644, 430 S.E.2d 254 (1993), we found admissible under North Carolina Rule of Evidence 404(b) evidence that the defendant had stolen the weapon he used to commit the murder for the purpose of proving that he possessed it as well as to prove the circumstances under which it was acquired. *Id.* at 658, 430 S.E.2d at 262. We noted in *Rannels* that this type of evidence is generally admissible in a homicide prosecution as tending to establish the guilt of the accused. "Only when the evidence of other crimes or wrongs has no other probative value than to show the bad character of the accused in order to prove his 'propensity or disposition to commit an offense of the nature of the crime charged' should the evidence be excluded." *Id.* at 657, 430 S.E.2d at 261 (quoting *State v. Coffey*, 326 N.C. 268, 279, 389 S.E.2d 48, 54 (1990)). Further, we note that the State's evidence, including testimony describing defendant's acts and statements during the pawn shop robbery, shed light on several probative issues in the case, including defendant's similar motive, *modus operandi*, identity as the instigator, and procuring of the murder weapon.

We find it unnecessary to engage in a balancing act to determine whether the prejudicial effect of the pawn shop robbery outweighed its probative value. The evidence in the case tended to describe at least three different armed robberies in which defendant had previously participated. It is unlikely that evidence of defendant's armed

robbery of Bunny's Pawn Shop was prejudicial in view of the evidence of defendant's other armed robberies offered at trial. This assignment of error is overruled.

By another assignment of error, defendant contends that the jury's failure to find any mitigating circumstance, either statutory or nonstatutory, indicates that the jury arbitrarily recommended the death sentence in violation of defendant's constitutional rights. We disagree.

[11] In particular, defendant contends that the jury's failure to find the N.C.G.S. § 15A-2000(f)(4) mitigating circumstance, that "defendant was an accomplice in or an accessory to the capital felony committed by another person and his participation was relatively minor," was supported by uncontradicted evidence. Defendant argues that since he was not present when Saunders shot the victim, the jury should have found him to be a minor participant and should have found the (f)(4) mitigator. Defendant's contention is misplaced. Although the evidence was undisputed that defendant was not present during the killing, reasonable minds could disagree as to whether defendant's participation was minor. The jury is free to decide, upon consideration of the surrounding circumstances presented to it, whether it believes the evidence warrants finding a mitigating or aggravating circumstance to exist. *State v. Alston*, 341 N.C. 198, 256-57, 461 S.E.2d 687, 720 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 100 (1996).

[12] Defendant further contends that the jury's failure to find nonstatutory mitigating circumstances concerning defendant's family history and upbringing indicate that the death sentence was arbitrarily imposed in violation of defendant's constitutional rights. The trial court gave the jury peremptory instructions on six of the eleven nonstatutory circumstances, yet no juror found any mitigation. We note that defendant made no objection to the trial court's instructions. In *Alston*, we said that the jury may determine that a nonstatutory mitigating circumstance has no value even if that circumstance is found to exist. *Id.* at 257, 461 S.E.2d at 720. The jury could rationally have rejected these nonstatutory mitigating circumstances on the basis that they had no mitigating value. We believe that the jury's written responses on the Issues and Recommendations form submitted to it show that it considered and rejected the mitigating circumstances. It is not our role to second-guess the jury under these circumstances. In the absence of contradictory evidence, we must assume that the jury

comprehended the trial court's instructions and the Issues and Recommendations form. The fact that the jury in this case considered and rejected all of the mitigating circumstances submitted to it does not indicate a violation of defendant's constitutional rights. This assignment of error is overruled.

By another assignment of error, defendant contends that the trial court erred by failing to submit to the jury two nonstatutory mitigating circumstances which defendant requested. These were: (1) that "defendant discontinued school at the age of 16," and (2) that "defendant was not present when Theolas [sic] Saunders shot Wayne Thomas." We address each contention in turn.

[13] We find no error in the trial court's failure to submit the proposed mitigating circumstance that "defendant discontinued school at the age of 16." In order for defendant to succeed on this assignment of error, he must establish that (1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2) there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury. *State v. Benson*, 323 N.C. 318, 325, 372 S.E.2d 517, 521 (1988). We conclude that defendant has not made such a showing. The evidence presented was ambiguous as to whether defendant stopped going to school completely or was merely suspended temporarily but had not completely discontinued his schooling. Dr. Glenn Rohrer testified at trial that defendant was a highschool dropout and that this decision adversely affected defendant's self-esteem, industriousness, and employment opportunities. However, he also testified that "there was some question about exactly when he quit." In light of this ambiguity and the absence of additional evidence which might have clarified the issue, it was not error for the trial court to fail to submit this mitigating circumstance.

[14] Defendant further contends that the trial court erroneously failed to submit a second mitigating circumstance, that "defendant was not present when Theolas [sic] Saunders shot Wayne Thomas." Looking at the record and transcript, we find that this nonstatutory mitigating circumstance was in fact submitted to the jury, albeit in a different form than defendant requested. The tenth nonstatutory mitigating circumstance which the trial court submitted to the jury was "[t]hat at the time Theolas [sic] Saunders shot Wayne Thomas[,] Charles Bond was in the hospital seeking treatment for a self-inflicted wound." Thus, the circumstance actually submitted to the jury

embodied the notion requested by defendant. This Court has found harmless error where a proposed nonstatutory mitigating circumstance was subsumed by the submission of another nonstatutory mitigating circumstance. *State v. Benson*, 323 N.C. 318, 326-27, 372 S.E.2d 517, 522 (1988). We conclude that defendant's proposed nonstatutory mitigating circumstance was subsumed by the submission to the jury of another nonstatutory mitigating circumstance, and any error here was harmless. This assignment of error is overruled.

[15] By another assignment of error, defendant contends that the trial court erroneously combined two of defendant's requested nonstatutory mitigating circumstances into one where, defendant argues, each requested mitigating circumstance directed the jury to distinct mitigating evidence. Defendant requested the following two circumstances: (1) that defendant began his substance abuse at the age of nine; and (2) that defendant has been diagnosed as being dependent on a combination of alcohol, cocaine, and marijuana. The trial court combined these two factors into one and submitted the following circumstance: "The defendant began his substance abuse at the age of nine, and has been diagnosed as being dependant [sic] on a combination of alcohol, cocaine, and marijuana." In addition, the trial court submitted the catchall, "any other circumstance or circumstances arising from the evidence which one or more of you deems to have mitigating value." Defendant argues that combining these aspects of his character into a single circumstance may have precluded full consideration of mitigating evidence. We disagree.

As stated previously, this Court has found harmless error where a proposed nonstatutory mitigating circumstance was subsumed by the submission of another nonstatutory mitigating circumstance. *Id.* Defendant's argument is based on the notion that the jury would have been more impressed with the mitigating value of the proffered evidence if it had been separated into two mitigating circumstances, rather than consolidated into one. We find this argument unpersuasive. As we stated in *State v. Greene*, 324 N.C. 1, 21, 376 S.E.2d 430, 442 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), we reject the mechanical, mathematical approach to capital sentencing.

Here, the jury was not precluded from considering evidence of defendant's early introduction to alcohol and drugs, nor was it prevented from considering evidence of defendant's present substance abuse problem. The jury heard and considered testimony from a cer-

tified substance-abuse counselor regarding defendant's involvement with alcohol at the age of nine and his continued drug and alcohol abuse. In addition, the court submitted the "catchall" mitigating circumstance for the jury's consideration. The trial court's refusal to submit the requested nonstatutory mitigating circumstances separately was not error. We find no merit in this assignment of error, and it is overruled.

[16] By another assignment of error, defendant contends that the trial court erred by permitting a lay witness to testify as to defendant's lack of mental retardation. Defendant argues that this was unreliable and irrelevant opinion testimony and that its admission violated defendant's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, and 27 of the North Carolina Constitution. Defendant contends he must be resentenced. We disagree.

The North Carolina Rules of Evidence do not apply to sentencing hearings. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992). Any competent, relevant evidence which wil substantially support the imposition of the death penalty may be introduced at this stage. *State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 739 (1996). Two of defendant's former teachers and a certified social worker who had examined him testified that he was mentally retarded. The State presented evidence to rebut this mitigating evidence. Officer Gregory Bonner testified that based on personal experiences with defendant, he did not think defendant was mentally retarded. Defendant objected, and the trial court overruled the objection.

Although the Rules of Evidence do not apply in sentencing proceedings, they may be helpful as a guide to reliability and relevance. *See Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597 (1980). Under those rules, a lay witness may testify in the form of an opinion if the opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C.G.S. § 8C-1, Rule 701 (1986). We have held that the mental condition of another is an appropriate subject for lay opinion. In *State v. Strickland*, 321 N.C. 31, 361 S.E.2d 882 (1987), we noted that " '[a] lay witness, from observation, may form an opinion as to one's mental condition and testify thereto before the jury.' " *Id.* at 38, 361 S.E.2d at 886 (quoting *State v. Moore*, 268 N.C. 124, 127, 150 S.E.2d 47, 49 (1966)).

Evidence introduced at a capital sentencing proceeding must be relevant, be competent, and have probative value. Officer Bonner's testimony, based on his firsthand observation of defendant, met this test, and we conclude that it was not error to allow him to testify as to his opinion of defendant's mental condition. This assignment of error is overruled.

[17] By another assignment of error, defendant argues that the trial court erred by permitting the jury to view the Volkswagen vehicle in which defendant, Saunders, and the victims traveled for nearly eight hours. At the close of the State's sentencing evidence, the prosecutor requested that the jury be allowed to view the Volkswagen in order to show the small size of the interior of the twenty-year-old vehicle and to show that the murder was especially heinous, atrocious, or cruel. Defendant objected on the grounds that it was not proper and that the condition of the vehicle had changed because Saunders had wrecked the vehicle after the crimes at issue were committed. Over defendant's objection and upon a showing by the State that a witness could testify as to the changed condition of the car, the trial court allowed the jury view. Defendant contends that the trial court abused its discretion by allowing the jury view of the Volkswagen because (1) this evidence was irrelevant to establish the especially heinous, atrocious, or cruel aggravating circumstance; and (2) it was unreliable because the condition of the car had changed because Saunders had wrecked the car when he ran into a roadblock just before he was arrested. We address each contention in turn.

Defendant first argues that the evidence was outside the scope of the especially heinous, atrocious, or cruel aggravating circumstance because this circumstance is limited to the manner of the killing itself. Defendant contends that the cramped and uncomfortable eight-hour ride which the victims suffered at the direction of defendant may have aggravated the kidnappings, but did not aggravate the murder. We stated in *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979), that the especially heinous, atrocious, or cruel circumstance is focused upon acts done to the victim during the commission of the capital felony itself. *Id.* at 25, 257 S.E.2d at 593. We conclude that this evidence was relevant to show the circumstances of the crime and the nature of defendant's acts in confining the victims in a small, cramped automobile for nearly eight hours. The jury view was probative because many jurors may not have owned, ridden in, or had any knowledge of a Volkswagen "beetle" and therefore might not have known the size of the interior. Thus, we conclude that the trial court

properly exercised its discretion in permitting the jury view of the Volkswagen vehicle.

Defendant next contends that the evidence was rendered unreliable by the fact that the vehicle was wrecked after the crimes took place. We disagree. The jury was informed of the changed condition of the exterior by a witness for the State, Sheriff Perry. Sheriff Perry testified that he first saw the vehicle being driven by Theola Saunders immediately after the murder and that he did not see any damage. He also testified that the majority of the damage now seen on the Volkswagen occurred at the wreck when Theola Saunders ran into the roadblock after the murder. On redirect, Sheriff Perry stated that there was no change to the interior of the Volkswagen. Thus, we conclude that on these facts, the evidence was not rendered unreliable. This assignment of error is overruled.

[18] By another assignment of error, defendant argues that the trial court erred by failing to admit evidence at defendant's sentencing hearing that showed that the principal, Theola Saunders, was ineligible for the death penalty. Defendant contends that because he was an accessory and not a coconspirator acting in concert, the fact that Saunders could not have received the death penalty was mitigating evidence. We disagree.

The basic thrust of defendant's argument is that although most of the common law distinctions between principals and accessories have been abrogated by statute, a derivative relationship remains between the principal and an accessory to a crime. Defendant contends that the derivative relationship between the culpability of the principal and the culpability of an accessory makes any leniency afforded the principal a "circumstance of the offense," citing *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), for such a proposition. Such leniency, defendant contends, is relevant to the determination of the accessory's sentence. We are unpersuaded.

The pertinent text of *Lockett* to which defendant refers states that the Constitution requires that the sentencer "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 57 L. Ed. 2d at 990. As this Court noted in *State v. Irwin*, 304 N.C. 93, 282 S.E.2d 439 (1981), the Court in *Lockett* went on to say that "evidence irrelevant to these factors may be properly excluded by the trial court." *Id.* at 104, 282 S.E.2d at 447 (citing *Lockett*, 438 U.S. at 604

n.12, 57 L. Ed. 2d at 990 n.12). In *Irwin,* we held that evidence of a plea bargain and sentencing agreement between the State and a codefendant was not admissible as a mitigating circumstance because such evidence did not pertain to "defendant's character, record, or the nature of his participation in the offense." *Id.* We reaffirmed this holding in *State v. Williams,* 305 N.C. 656, 292 S.E.2d 243, *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), saying:

> The fact that the defendant's accomplices received a lesser sentence is not an extenuating circumstance. It does not reduce the moral culpability of the killing nor make it less deserving of the penalty of death than other first-degree murders. *See State v. Hutchins,* 303 N.C. 321, 279 S.E.2d 788 [(1981)]. The accomplices' punishment is not an aspect of the defendant's character or record nor a mitigating circumstance of the particular offense. *See Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973 (1978). It bears no relevance to these factors, and thus there was no error in the judge's refusal to submit it to the jury.

*Williams,* 305 N.C. at 687, 292 S.E.2d at 261-62. We conclude that the codefendant's death-sentence ineligibility in this case was properly excluded from the jury's consideration as a mitigating circumstance. This assignment of error is overruled.

**[19]** By another assignment of error, defendant contends that the trial court erred by three times submitting the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that this murder was committed during the course of a felony. Defendant contends that the legislature did not intend for the (e)(5) aggravating circumstance to be submitted more than once when a defendant engaged in multiple felonies while committing a murder. Having previously interpreted this statute otherwise, we disagree.

We have interpreted N.C.G.S. § 15A-2000(e) to permit the submission of separate aggravating circumstances pursuant to the same statutory subsection if the evidence supporting each is distinct and separate. *State v. Moseley,* 338 N.C. 1, 449 S.E.2d 412 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 738 (1995). In *Moseley,* where the defendant was convicted of committing two separate offenses against the same victim, the defendant argued that the submission of two aggravating circumstances based on the same course of conduct was redundant. *Id.* at 54, 449 S.E.2d at 444. This Court found in *Moseley* that each crime the defendant had committed was supported by distinct evidence; the only overlap between the two convictions was the

fact that the defendant in *Moseley* committed both crimes against one victim. We concluded that this overlap did not rise to the level of redundancy and that it was proper for the trial court to submit the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance twice. *Id.* at 55, 449 S.E.2d at 444. We reiterated in later cases that it is proper for a trial court to allow such multiple submission of the (e)(5) aggravating circumstance. *See, e.g., State v. Robinson*, 342 N.C. 74, 463 S.E.2d 218 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 793 (1996); *State v. Gregory*, 340 N.C. 365, 459 S.E.2d 638 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996).

In the present case, defendant was convicted of the first-degree murder of Wayne Thomas, the first-degree kidnappings of Wayne and Leslie Thomas, and one count of robbery with a dangerous weapon. Thus, there were three separate felonies submitted by the trial court as separate circumstances which the jury could find aggravated the murder. The State presented distinct evidence that defendant committed each of these three felonies against the two victims during the course of the murder. As we stated in *Moseley*, where each crime is supported by distinct evidence, such evidence supports the submission of multiple aggravating circumstances. We hold that it was proper for the trial court to submit the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance three times based on three separate and distinct felonies committed by defendant during the course of the murder. This assignment of error is overruled.

By another assignment of error, defendant contends that the trial court erred in permitting the prosecutors to engage in improper argument during the capital sentencing proceeding of defendant's trial. He contends that the prosecutors made two improper arguments to the jury, to wit: (1) implying that our capital sentencing structure was derived from biblical law, and (2) asking the jurors to put themselves in the place of the victims and their family members. We address each contention in turn.

Defendant first argues that the trial court erred in allowing the first prosecutor to use biblical references to support her closing argument at sentencing. The prosecutor argued that "the Bible says that he that smiteth a man so that he dies shall surely be put to death" and later that "lynch mob activity has always been condemned by the Good Book, but justice under the law has always been upheld and supported by the Good Book." Defendant objected to both of these arguments, and his objections were overruled by the trial court. Defendant argues that these references to the Bible told the jury that

the State's authority comes from the Bible, in violation of this Court's decision in *State v. Laws*, 325 N.C. 81, 120, 381 S.E.2d 609, 632 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). We disagree.

[20] The trial court properly overruled defendant's first objection to the argument that in the Bible it says that "he that smiteth a man so that he die shall surely be put to death." The prosecutor was anticipating and rebutting an argument which she had reason to believe defense counsel would raise in reference to the propriety of the death penalty. Just before making the argument to which defendant objected, the prosecutor said:

> Ladies and Gentlemen of the jury, they may come and say to you thou shalt not kill. That's what everybody says in opposition to the death penalty. It kind of gets you—thou shalt not kill. But ladies and gentlemen of the jury, that is a commandment as to how we are to conduct ourselves one with another in society, how [defendant] is supposed to conduct himself with people like Wayne Thomas.

The prosecutor was quoting the rest of the biblical passage which she anticipated defense counsel would quote during closing arguments. We have noted that "more often than not," we have concluded that such biblical arguments are within permissible margins given counsel in arguing "hotly contested cases." *State v. Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

[21] The trial court also overruled defendant's second objection to the prosecutor's argument that "justice under the law has been upheld and supported by the Good Book." Looking at the transcript, we note that just before making this argument, the prosecutor told the jury, "we are not trying this case by Biblical law. We are trying this case by man's law, North Carolina General Statute 15A-2000." In *State v. Walls*, 342 N.C. 1, 463 S.E.2d 738 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 794 (1996), we stated that an argument which "clearly informed the jury that it was to make its sentencing decision based upon N.C.G.S. § 15A-2000, and not the Bible . . . was not improper." *Id.* at 61, 463 S.E.2d at 770. In reviewing this issue in *State v. Rose*, 339 N.C. 172, 451 S.E.2d 211 (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 818 (1995), we reaffirmed our prior holdings. In the present case, the prosecutor's biblical references appeared in only four pages of a thirty-five page closing argument. Moreover, the pros-

ecutor cautioned the jury that this case was not being tried by biblical law, but by man's law, specifically referencing N.C.G.S. § 15A-2000. We find no error in the trial court's overruling defendant's objections to the biblical references made by the prosecutor.

[22] Defendant next argues that the references to the victims or their family members made by a second prosecutor during the closing arguments of the capital sentencing proceeding were so improper that the trial court had a duty to intervene *ex mero motu* to cure the error. The defendant contends that on two separate occasions the prosecutor told the jurors to put themselves in the place of the victims or the victims' family members. After carefully reviewing the transcript, we find that the prosecutor did not tell the jurors to put themselves in these positions. Rather, the prosecutor asked if the jurors could *imagine* themselves in the position of the victims' parents and then later asked if they could *imagine* themselves as Leslie Thomas. The pertinent part of the prosecutor's argument was:

> What on earth, ladies and gentlemen of the jury—you raise somebody up, get ready to get them married, and what happens? They're taken away from you not through God, not through disease or illness, but because someone is so mean and doesn't want to work, doesn't care, doesn't care. And he doesn't shed a tear for them and he doesn't care.

We have held that such an argument is permissible as a type of victim-impact argument. *State v. Conaway*, 339 N.C. 487, 528, 453 S.E.2d 824, 850, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 153 (1995). As we stated in *Conaway*, "this argument merely served to remind the jury that the victims were sentient beings with close family ties before they were murdered by defendant." *Id.* at 528, 453 S.E.2d at 850. In any event, the argument at issue here was not so grossly improper as to require the trial court to intervene *ex mero motu*.

[23] The next argument the prosecutor made, about which defendant complains, referred to the victim, Leslie Thomas:

> Can you imagine if this had happened to yourself; the horror of being in that Volkswagen eight hours with this man holding that little gun and the kid holding the shotgun and switching them back and forth? And having your own brother rob a store and not knowing whether he was going to come back dead or not, whether the police may kill him? And being pregnant at the same time in that tiny car and this defendant asking those questions . . .

you're not coming back until I get my money . . . and if I don't get my money before daylight, you're dead. And going through that; is that not momentous? Does that not count?

This Court has repeatedly found no impropriety in a prosecutor's argument asking the jury to try to *imagine* the fear and emotions of a victim. *State v. Campbell*, 340 N.C. 612, 636, 460 S.E.2d 144, 157 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 871 (1996); *Gregory*, 340 N.C. at 426, 459 S.E.2d at 674. In *State v. Garner*, 340 N.C. 573, 459 S.E.2d 718 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 872 (1996), we found no gross impropriety in the prosecutor's argument explicitly asking the jurors to place themselves in the position of the victims of the murders. *Id.* at 596-97, 459 S.E.2d at 730-31. As defendant failed to object to the prosecutor's arguments of which he now complains, our review on appeal is limited to the question of whether the arguments were so grossly improper as to require the trial court to intervene *ex mero motu. McCollum*, 334 N.C. at 225, 433 S.E.2d at 153. We conclude that these arguments were not so grossly improper as to require the trial court to intervene in the absence of an objection by defendant. This assignment of error is overruled.

[24] By another assignment of error, defendant contends the trial court erred by failing to give a peremptory instruction on the N.C.G.S. § 15A-2000(f)(4) statutory mitigating circumstance. Defendant argues that the evidence was uncontradicted that defendant was not present when Wayne Thomas was killed, but was in the hospital receiving treatment for an injured foot. He contends that it was incumbent upon the trial court to peremptorily instruct the jury to find "that defendant was an accomplice in or an accessory to the felony murder committed by another person and his participation was relatively minor." Defendant argues that the fact that the jury did not find the existence of the (f)(4) mitigator shows that the trial court committed error in failing to give the jury a peremptory instruction. We disagree.

Upon careful review of the transcript, we find that the evidence was not uncontroverted as to each aspect of the (f)(4) mitigating circumstance. Part of the State's argument was that defendant was not a minor participant in this crime, but that defendant had orchestrated the robbery, attempted robberies, and kidnappings and had great influence over his young accomplice. The State's evidence tended to show that defendant was twenty-nine years older than his accomplice, that defendant planned the scheme of going to Virginia to com-

mit armed robbery, that defendant equipped Theola Saunders with the murder weapon Saunders ultimately used to kill Wayne Thomas, that defendant took control of the car from the Thomases at gunpoint, and that defendant gave all the orders to Saunders. Defendant sought to challenge this evidence at all stages. Thus, the evidence as to the (f)(4) mitigator was hotly contested, and we hold that the trial court properly denied defendant's request for a peremptory instruction on this proposed mitigating circumstance. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant also raises for "preservation" the following six issues: (1) the trial court erred by permitting the bailiff to have *ex parte* contact with prospective jurors, (2) the trial court erred by denying defendant's motion to examine jurors about defendant's parole eligibility, (3) the trial court erred by declining to impose judgment and sentence for defendant's noncapital convictions prior to the sentencing hearing, (4) the trial court erred by placing the burden of proof on defendant with respect to mitigating circumstances and by declining to instruct the jury on the preponderance of the evidence standard, (5) the trial court erred by failing to instruct in accordance with defendant's request to prohibit jurors from rejecting submitted mitigation on the basis that it had no mitigating value, and (6) the trial court erred by failing to clearly instruct the jury that the jury should answer "no" to Issues Three and Four unless the jury unanimously decided that the answer to these issues was "yes." We have considered the defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule each of these assignments of error.

## PROPORTIONALITY REVIEW

Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, we turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. It is our duty in this regard to ascertain (1) whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988) (amended 1984). After thor-

STATE v. BOND

[345 N.C. 1 (1996)]

oughly examining the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must turn then to our final statutory duty of proportionality review.

[25] In the present case, defendant was convicted of premeditated and deliberate first-degree murder. The jury found the following aggravating circumstances: that defendant had been previously convicted of a violent felony, N.C.G.S. § 15A-2000(e)(3); that defendant killed the victim while he was an aider and abettor in the commission of robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5); that defendant killed the victim while he was an aider and abettor in the commission of the first-degree kidnapping of Leslie Thomas, N.C.G.S. § 15A-2000(e)(5); that defendant killed the victim while he was an aider and abettor in the commission of the first-degree kidnapping of Wayne Thomas, N.C.G.S. § 15A-2000(e)(5); and that the murder was committed as part of a course of conduct including other violent crimes, N.C.G.S. § 15A-2000(e)(11). Of the thirteen mitigating circumstances submitted, including one statutory mitigator as well as the catchall, the jury did not find any mitigating circumstances to exist. Defendant argues that the death penalty in this case was arbitrary based on the fact that the jury did not find any mitigating circumstances. We find this contention to be without merit.

Eight of the mitigating circumstances submitted and not found dealt with defendant's childhood up to age fourteen. Defendant was forty-five years old at the time he committed the crimes in this case. A jury could rationally have found that defendant's childhood circumstances did not warrant a mitigating effect on his violent criminal activity over thirty years later. Further, the jury could rationally have rejected the submitted mitigating circumstance that defendant's participation in the crimes was relatively minor. The State's evidence tended to show that defendant exerted dominance over his sixteen-year-old accomplice and was in charge of their crime spree. The evidence that defendant set up the murder, gave the juvenile the weapon, and instructed him what to do with it could rationally have persuaded the jury that defendant's participation was not minor. We conclude that the fact that the jury did not find the existence of any mitigating circumstances does not indicate that the death sentence was arbitrarily imposed.

**STATE v. BOND**

[345 N.C. 1 (1996)]

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *McCollum*, 334 N.C. at 240, 433 S.E.2d at 162. We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. This case has several features which distinguish it from the cases in which we have found the death penalty to be disproportionate. They are: (1) defendant orchestrated the killing of an unarmed victim whom defendant kept hostage after kidnapping him from his own home at gunpoint and forcing him against his will to commit armed robbery for defendant's financial gain; (2) defendant was in a position of control during the crimes at issue and subjected a sixteen-year-old boy to his dominance, ordering that the boy kill the victims if they "messed up"; (3) defendant had previously been convicted of four violent felonies, including manslaughter, second-degree robbery, armed robbery, and aiding and abetting an armed robbery. We find it significant that in none of the cases in which this Court has found the death penalty disproportionate were there multiple victims or multiple major felonies committed during the crime. Moreover, none of the defendants in those cases had previously been convicted of multiple violent felonies.

Of the seven cases in which this Court has found the death penalty disproportionate, only two, *Bondurant* and *Young*, contained multiple aggravating circumstances. The instant case contains five aggravating circumstances, all supported by competent evidence. Three of the aggravating circumstances submitted and found by the jury in this case were that defendant had previously been convicted of three violent felonies. We have noted that a jury's finding of this aggravating circumstance is significant in finding a death sentence proportionate. *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 752 (1995). In a recent case, we determined that none of the cases in which the death sentence was found to be disproportionate have included this aggravating circumstance. *State v. Rose*, 335 N.C. 301, 351, 439 S.E.2d 518, 546, *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 883 (1994).

STATE v. BOND

[345 N.C. 1 (1996)]

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Features of this case which are present in cases where this Court has found a death sentence proportionate include: the killing was part of an armed robbery; the killing was done to eliminate a witness; and there were two victims, one of whom survived. These features were present in *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995), and in *State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

Another distinguishing feature of this case which makes the death penalty proportionate is the fact that the jury convicted defendant of first-degree murder under the felony murder rule and based on malice, premeditation, and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Artis*, 325 N.C. at 341, 384 S.E.2d at 506; *see State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162 (1994).

As to defendant's character, we find morally reprehensible the fact that defendant enlisted the help and directed the criminal course of conduct of a teenager, Theola Saunders, for defendant's financial gain. Both the circumstances of the crime and the character of the defendant demonstrate that the death penalty is proportionate for this defendant. Accordingly, we conclude that the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

For the foregoing reasons, we conclude that defendant received a fair trial, free of prejudicial error, and that the sentence of death entered in the present case must be and is left undisturbed.

NO ERROR.